18-834-AG and 19-737-AG. We'll hear first from Attorney Ahmed. Good morning, Your Honor, and may it please the Court. Amer Ahmed to Petitioner Dwayne Anthony Ottey. Your Honor, there's no dispute that Mr. Ottey was brought to this country as a toddler. Everyone agrees, including the IJ here, that he was in the United States as a young child, at least as early as the age of three. So the chief issue on this appeal is whether he was duly, quote, admitted to the country within the meaning of the INA after, as he contended, being presented for inspection to an immigration officer at JFK Airport when he was just a baby. If he was so admitted under the legal test set forth by the BIA in the Killanton case, Q-U-I-L-A-N-T-A-N, that would require termination of Mr. Ottey's proceedings altogether, which are premised entirely on the assumption that he was not duly, quote, admitted within the meaning of the INA. Turning to the primary appeal dispositive issue, which is that Mr. Ottey did make a showing he was admitted under the Killanton standard. The first threshold point under that Killanton issue is why a showing of admission is critical and dispositive here. You see, Your Honor, a showing of, quote, admission would take INA 212A out of the picture, which is the only provision of the INA under which the DHS charged Mr. Ottey as removable. Now, lest there be any confusion on that point, 212 does not set forth independent grounds for expulsion from the country. All the grounds set forth in the admissions to the country, and the statutory language confirms that. 8 U.S.C. 1229A, entitled Removal Proceedings, defines removable in the disjunctive, with admitted aliens subject to deportability alone under Section 1227 as grounds for removal. And that's in 8 U.S.C. 1229A, subsection E, subsection 2, where it says the term removal means, in the case of an alien admitted to the United States, that the alien is deportable under Section 1227. This court confirmed that reading in the Ibrahimov case, I-B-R-A-G-I-M-O-V, cited at page 27 of our opening where the court said, quote, an alien prior admission, well known, is also dispositive in determining which particular charge of removability is appropriate to his removability proceedings. So once the predicate of admission is established in any case, someone must be charged under deportability provision, Section 1227 alone, and that's not the case here. Accordingly, that's exactly what Mr. Adi argued below in his motion to terminate, and that binary statutory mechanism explains why the government effectively conceded below that a showing of admission would defeat the inadmissibility charge altogether. The second threshold point on the Killanton issue is about reviewability. And, Your Honor, the fact that the Killanton issue is dispositive of the correctness of the charge here explains why the government wants to cut off review of the Killanton challenge altogether. At pages 40 to 42 of their brief, the government argues that Section 1252A2 makes the Killanton challenge unreviewable because it's just about, quote, weighing of the evidence. That is incorrect. The challenge here is to the misapplication of the Killanton legal standard to record facts, and that presents an issue for review under the INA. Any doubt on that score was eliminated by Supreme Court just last week in Guerrero, Las Grillas, and we submitted the Rule 28J letter about this, where the question was whether or not someone had shown sufficient diligence to get estoppel of a deadline. The court held that application of a legal standard to a set of facts is a reviewable question of law, which is the very same view of reviewability we argued in our brief and that this court has held over again over the years. The second point that the government ignores on this is that there is no factual determination that Mr. Adi did not enter through JSK, so we're not trying to overturn a factual determination in that regard. The determination here was whether or not, as applied, the Killanton standard had been satisfied, and that was in error. So we've got a reviewable defaulted error, which is on the sufficiency of the Killanton showing, and that's why you've got to look at the Killanton decision, which is of critical importance in two respects. First, the decision addresses any use of the term, quote, admitted in the INA, because that decision interprets the definitional provision. You have one minute left. Thank you. The suggestion otherwise is put in one of the government's briefs as well. And second, the facts in Killanton show that a respondent's own testimony alone tells you that a sufficient showing can be provided by the most interested party and the most interested witness. Measured against that standard, the legal error is obvious here. The Killanton showing consists of sworn testimony by Mr. Adi's father, who arranged for commercial air transport. That testimony was entirely consistent with his sworn declaration. There was no adverse credibility finding against Mr. Adi, which means on appeal, his testimony gets presumption of credibility. And the government effectively waived, and he explicitly waived further cross-examination on the manner of the entry testified to by Mr. Adi. There was corroborating evidence in terms of immunization and vaccination records, and on that background, the IHA bent over backwards to flunk the testimony, giving it minimal weight, in effect discrediting it by a cross-examination that had never occurred. Your Honor, the other additional issue in my final few seconds here is that we have raised an issue about the New York Possession Offense that Mr. Adi pled guilty to pre-2016. That offense is not a crime involving moral perpetuity. Under a combination of this Court's decision in Obeah and the Supreme Court's decision in the Mullooly case in 2015, Mullooly tells you that you cannot look at removability in isolation. Instead, if you're looking at two crimes and the BIA's disparate treatment of those two crimes for purposes of removal, you've got to ask yourself whether that disparate treatment leads to incongruous results. In the pre-2016 period, when larceny was not a CIMT, as this Court held in Obeah, and possession was a CIMT, the BIA's disparate treatment of those two offenses makes no sense and is not deserving of death sentence. The government primarily relies on the Michel decision from the year 2000. Effectively, that decision has been superseded because an underlying assumption of the decision has been removed. Mullooly adds a common-sense layer of analysis to the removal question, and it tells you that when the consequences for a petitioner are expulsion from the country, the BIA's treatment of offenses for purposes of removal must be given added scrutiny. Thanks very much, Mr. Achmed. We appreciate it. I'll proceed today by asking each of, after the argument, time is consumed by counsel, I will turn to my colleagues on the bench in order of seniority and ask them whether they have any questions to put to counsel. I'll turn now to Judge Kearse. I have no questions. Thank you. Judge Walker? No, I have no questions. Mr. Achmed, I have a very simple question. Do I understand your argument to be that we don't have to reach the moral turpitude issue at all? Your Honor, if you resolve the question on Tlantzan in our favor, it's true that the charging document is deficient and the proceedings would be terminated. We would urge you, however, to reach the moral turpitude issue as well because it has material downstream effects on whether or not our petitioner would have to apply for a 212H waiver if there was still a charge. You are correct. If you just reach the first issue, you would terminate the charging document. Thanks very much. We'll hear now from opposing counsel, Mr. Wetmore. Good morning and may it please the Court, David Wetmore for the Attorney General. Contrary to my opposing counsel's characterization of the entry issue, this is really a factual dispute and it must be reviewed under the highly deferential substantial evidence standard. The government proved that Mr. Awdy was illegally present based on his own admission that he's a Jamaican citizen and that he has no status in the United States. The burden then shifts to Mr. Awdy to prove by clear and convincing evidence the time, place, and manner of his entry if he contends that his entry was in fact lawful. So, there were four hearings held on that issue before the immigration judge. The entire time, Mr. Awdy was represented very confidently by the Brooklyn Defender Services. The IJ granted four continuances to flesh out this evidence despite the fact that Mr. Awdy was detained this entire time, which is really an extraordinary effort to ensure that due process was carried out in this case. Now, let's look at the evidence that he presented. Well, before I get to that, I would just note that based on the 28J letter that was submitted, the Guerrero-Lasprilla case is inapplicable here. There's clearly a factual dispute and the Supreme Court in Guerrero-Lasprilla was addressing an instance where the law is, it's a mixed question of law and fact, where the law is being applied to undisputed facts. There's no dispute here that the facts are in fact in dispute and that they must be reviewed for substantial evidence. What does that mean? That means, based on this court's precedent and Wu-Bao Chen, that merely presenting a plausible alternative theory is not enough to secure reversal under the substantial evidence standard and that any reasonable adjudicator must be compelled to conclude to the contrary. Based on the scant evidence that's present in the record here, that standard is far from being met by Mr. Otte. We have two very strange declarations that were presented. First, by his father, who apparently the tactical decision was made not to have him go into the consulate or embassy down in Jamaica in order to provide his testimony on a competent telephone line, but rather his counsel chose to provide a cell phone number that was frankly insufficient to even conduct the hearing in any meaningful way. He got some of his testimony out. He was impeached based on some of his removal testimony and at that point the government moved on. Next, we have the testimony of his purported mother, a woman known as Pansy Cohen, who submitted various affidavits but refused to come in and testify in person or provide evidence to confirm her identity. In fact, when the Department of Homeland Security ran a name and credit search on this individual, nothing appeared. That indicates that this individual likely illegally entered the country without inspection. Why is that important and why is that critical here? It's critical because this entire issue turns on Otte carrying his burden of proving that he in fact entered at JFK Airport in a lawful fashion with inspection. There's no direct evidence whatsoever in the record that that occurred. The individual with whom he allegedly traveled, a woman named Janet, there's no evidence directly from her. There's no flight evidence. Prior to the case being decided after four hearings, there was no effort made to check the records of admission of this individual with Otte at that time. However, what is in evidence here is a medical record showing that in fact Pansy Cohen, the mother of Mr. Otte, was in fact present in 1993, which leads one to wonder whether Mr. Otte in fact illegally entered with Ms. Cohen at some point prior to that. So the only evidence here in the record demonstrates that Otte is present, but it doesn't demonstrate his key burden of proof, which is time, place, and manner of entry. Everything about that is speculation from people who were not in fact present when he allegedly entered the country. Therefore, this court should find that there's not substantial evidence to overturn the agency's decision. Now with respect to the crime involving moral turpitude based on Mr. Otte's possession of stolen property conviction, this court's precedent in the 2000 case of Michelle clearly applies here. The majority of circuits have found, as the BIA has found since 1975 in Matter of Patel and in 1979 in Matter of Salveil, that there are two distinct crimes at issue here. Larceny, which Mr. Otte was charged with, which is no longer a crime involving moral turpitude based on this court's precedence. There's absolutely no issue with regard to that crime. However, the possession of stolen property charge, the board has consistently found, as have all the other circuits that have addressed this issue, the 3rd, the 7th, the 8th, the 10th, and the 11th, as we cite our brief, have all concluded that in fact it has a very different scienter requirement from that of larceny. Possession of stolen property scienter requirements merely shows the knowledge that the items are stolen. It does not have in any way a knowledge requirement to show that there is an intent to permanently deprive with larceny. This court recognized it in Michelle. The New York courts have recognized this in People v. Simmons that we cite in our brief. That was in 2016. The opposing counsel's citation to the Supreme Court's case in Malouli is a bit baffling. That case involved federal drug schedules and has nothing to do with the scienter requirement that's at issue here. In fact, the board in two published decisions since the Malouli decision in matter of Dang in 2017 and matter of Alde Dominguez, also in 2017. You have one more minute. Thank you. Distinguished those cases and continued its long line of precedent showing that receipt of stolen property is distinct in its knowledge requirements and theft. Therefore, the board did not in any way error in finding and relying on this court's precedent in Michelle and its recent precedents in matter of Dang and matter of Alde Dominguez to find that Mr. Alde's conviction for possession of stolen property constituted a crime involving moral turpitude. I look forward to any of the court's questions. Thanks very much. Judge Kearse? No questions. Thank you. Judge Walker? Yeah, I have one question. If the decision is made that here that he was admitted, I know you argue that he hasn't that. If for some reason that conclusion were reached, do you agree that the remedy for the petitioner is termination? Because the INS or the department proceeded under the wrong path within the immigration statute? Well, I wouldn't agree that initially that DHS proceeded under the wrong path. No, I'm not saying that you did. I'm saying if it turns out that he was lawfully admitted, or he was admitted, I don't know lawfully or not, but he was admitted and did not come in with his mother, but he came in with this woman, Janet, and she had every right to come in and brought him with her. Would you agree with what your adversary has said that if that's the case, then the only basis I think he said was section 1227, which was not charged? Yeah, the charge of removability that's at issue here would depend on whether he has demonstrated a procedurally valid entry. I just want to make sure that we're all on the same page. If he did demonstrate, if he were to demonstrate, which you argue of course he hasn't, demonstrated a valid entry, then the remedy would have to be termination of the proceedings, right? Because the right path, the path that would be available were he admitted was not charged. Yeah, it would be termination of that charge that's currently in the notice to appear. It wouldn't terminate his proceedings potentially. He could always be recharged by DHS under another provision of the INA, but under these charges, if he were to have demonstrated, which he clearly did not, and clearly there's no substantial evidence that would compel a finding that he demonstrated a procedurally valid entry, then that charge would in fact not apply in this instance. But again, I mean, the bizarre and scant evidence that's at issue here does nothing other than possibly suggest another alternative theory of the case, and there's ample evidence to support the finding that the agency reached that he came far from carrying his burden, not the government's burden, but his burden to show a procedurally valid entry when nobody witnessed it. There were no witnesses that could testify to this in any credible manner. My understanding though is that now there's evidence that Janet, who was not known at the time, her name wasn't even known initially, now her name and presumably her address are known, and so she could be a witness, whereas earlier she was not produced because that information was not available. Did you agree with that? No, I don't, Your Honor. It's one step too far. The information apparently from what is in the record indicates that Mr. Audie's mother, Pansy Cohen, who refused to come in and testify and be cross-examined based on her declaration that she submitted, which the government repeatedly attempted to achieve, and very competent counsel for Mr. Audie consistently refused, speculating that she would have to testify regarding her motive entry and whether Audie actually accompanied her to the United States rather than entering with a mysterious Janet figure. Wasn't there a question about her, the department taking the position that she would not, as to whether or not they would pursue a case against her if she came in and testified, and that at one point the department was taking the position that she could come in and effectively receive immunity based, I guess it would be some sort of transactional immunity based upon her coming in, and she wouldn't be pursued or prosecuted, but then change this position? Well, the department initially considered a limited use of prosecutorial discretion not to charge her with illegal presence or illegal entry depending on what the facts actually showed. They then, based on negotiations with Mr. Audie's counsel, asked for additional information to actually figure out who this person in fact is, and when we see her name appear in a couple of medical records, but there's zero name search for her. How did she get into this country? She's not in ICE's records in any way. If she were to have entered the country illegally or appeared and presented herself, she would have been in those records. They ran a credit search of her and nothing appears whatsoever, so this individual is basically a ghost. In lieu of allowing her to proceed, they asked for additional information so that they could actually confirm that this person existed. Well, the opposing counsel did produce eventually an affidavit or a notarized copy of this declaration. They ultimately withdrew the declaration at the end, so we have clearly somebody who's trying to hide something the entire time. It's also incredibly bizarre. The whole story is that this mysterious Janet goes to Jamaica, contacts Mr. Audie's mother, Pansy Cohen, and asks for a 22-month-old child to be handed over for photographs, at which point she essentially kidnaps Mr. Audie and takes him to New York, and then at some point thereafter, Ms. Cohen appears in the United States without any record of being ever inspected, and that's really what's at issue here is how did Mr. Audie actually arrive in the United States? If he came illegally without inspection with his mother, which is possible, and there was no effort made to show that that didn't in fact happen, we just have this but we have no record of who this Janet woman is. After four hearings and all this back and forth and no opportunity to cross-examine Ms. Cohen, after the agency reaches this decision, then at that point, all of a sudden, Mr. Audie's counsel comes back and says, oh, well, now Ms. Cohen has additional information on Janet, which that information has clearly been available throughout this entire proceeding. It was within her knowledge and as well as Mr. Audie's father's knowledge. I mean, this was his girlfriend. He clearly knew what her last name was and possibly her birth date. I mean, he lived with this person. All that information was previously discoverable, so in the context in which this quote new information was raised, which was a motion to reopen and reconsider, all of that information could have previously been brought out with a very, very monochrome of due diligence. Instead, it magically appears after the fact and after all these hearings and continuances were entered. Therefore, when the agency looked at that motion to reopen and reconsider, it found that this information could have easily been proffered prior to that, and when this court reviews that decision whether to reopen and reconsider, it does so under the abuse of discretion standard and clearly knowledge that's well in hand of both Mr. Audie's father and his mother regarding the identity and details of the identity of this mysterious Janet woman, if she ever existed, because there's no physical evidence in the record to show that she in fact existed at all. All of that information was available at the time of the initial evidentiary hearings. Mr. Whitmore, this is Judge Cabranes. Can we agree that you are, you're not claiming that we have to reach the moral turpitude issue, is that right? If in fact, well, I put it a different way. You agree that the threshold issue is admissibility and that this issue can be dispositive in this case. It could be dispositive under this record, yes, and we would suggest that it's, it would be dispositive in the sense that Audie failed to carry his burden and then we show that his conviction for possession of stolen property clearly constituted a crime involving moral turpitude, which then satisfied his ground of removability. You've invoked our decision of 2000 in Michelle. On that, with regards to Michelle, is it still good law in light of Malouli, M-E-L-L-O-U-L-I, Malouli against Lynch, the Supreme Court decision of 2015? Absolutely, your honor. Malouli, and it's a bit confusing why this case was cited. Malouli involved an issue involving federal drug schedules and state drug schedules. And there was a crime, a Kansas crime where it was drug paraphernalia, and it included some language with respect to relating to federal schedules where the state drug schedule was overbroad based on the federal schedule. In other words, the Kansas schedule included some controlled substances that were not on the federal list. So when invoking the modified categorical approach, the categorical approach in this instance, to find whether the statute was in fact overbroad, they found, the Supreme Court found that this sort of loose interpretation of relating to did in fact render it to be overbroad. That really has absolutely whatsoever nothing to do with the scienter requirement that differentiates larceny from possession of stolen property. In Michel, this court looked at that requirement with a slightly different statute. It only differed in the amount of property that the defendant Michel was charged with versus Mr. Audy. The scienter requirement was identical. The board has continued to rely on its precedents to find that, in fact, the scienter requirement for possession of stolen property is materially different and legally distinct from that of larceny. Larceny requires the intent to permanently deprive, whereas possession of stolen property requires knowledge that the items are stolen. And the New York state courts, as I mentioned earlier, in People versus Division 2016 stated, our examination of the elements of the two crimes, larceny versus possession of stolen property, persuade us it is theoretically possible for a person to possess the mental state required for guilt of grand larceny in the third degree and at the same time lack the mental state necessary for guilt of criminal possession of stolen property in the third degree. This clearly shows that post-Malouly, the New York state courts continue to believe that there is a materially distinct scienter requirement between those two offenses, and Malouly does nothing to blur that line or materially change any of that analysis. Thank you, Mr. Whittemore, very much. And I would also note that the 11th Circuit has addressed this post-Malouly in NASRAL, which is 762 Federal Appendix 638, and found collecting all of the cases across the circuits differentiating possession of stolen property from larceny and continue to follow that approach with no reference whatsoever to Malouly at all. Okay, thanks very much, Mr. Whittemore. Mr. Ahmed, you have one minute. Thank you, Your Honor. Very quickly, the government says first that this is a factual dispute, so we need to defer. That's incorrect in the government's invocation of the standards of time, place, and manner, and compelling evidence. There are no resemblance and no link to the Killanton decision. Those words and those phrases do not appear in that decision at all. There is no factual determination that Mr. Adi was not admitted in JFK in 1991. If there was, and we were trying to overturn that, that would be one thing. That's not what we have here. Secondly, Your Honor, Guerrero-Lasrilla is not inapplicable. The record here is effectively undisputed direct testimony. The government ignored, just like they ignored in their brief, that they waived cross-examination once the direct testimony was in the record. We can proceed without the rest of his testimony. The government did not move to strike the direct testimony and should not be heard in this court now to get the advantage of having effectively done a cross-examination that it never did. Thirdly, Your Honor, the government said there were four hearings. That's not correct. There was only one hearing where Mark Adi was allowed to testify, and the court said it would not hear from him again, even though it was going to have a further hearing in the case in any event. Finally, Your Honor, on CIMT and the Michelle question, the government is incorrect that the case is inapplicable, and here is why. Malouli doesn't have to do with just the drug statute. Malouli has to do with removability. That's the provision that's being interpreted, the INA provision that allows you to be removed for being convicted of a drug-related offense. So what bothered the Supreme Court was not whether or not that the BIA was interpreting a drug offense. It was whether or not the BIA was correctly drawing a line between two offenses, one of which gets you removed from the country and one of which does not. We should not brief on the case of people believing why the exact absurd outcome would happen here. For example, the passenger of a car would be thrown out of the country for convicting a crime involving moral curfew, even if he didn't intend to steal the car, whereas the driver, who did intend to steal the car, would be sitting pretty within the country. That is not a reasonable interpretation of the statute, of the removability provision of the INA, and therefore, it does not reserve Chevron deference, and after the O'Brien-Malouli decision, Michelle has effectively been superseded in that regard. Thank you, Your Honor. Thank you, Mr. Archman. Before we move to the second case, does Judge Kearse have anything to add? No further questions. And Judge Walker? No further questions. No further questions. Okay. We'll reserve decision on this case, and we'll move